## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JEREMY I. KOSMAC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-1480 |
| | ) | |
| THE NATIONAL RAILROAD | ) | |
| PASSENGER CORPORATION, *d/b/a* | ) | |
| *AMTRAK*; | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

## <u>MEMORANDUM OPINION</u>

Presently before the Court is the Motion for Summary Judgment filed by Defendant the National Railroad Passenger Corporation d/b/a Amtrak (hereinafter "Amtrak"). (Docket No. 29). The Court has considered the motion, Amtrak's brief in support thereof (Docket No. 30), Plaintiff Jeremy Kosmac's ("Kosmac") brief in opposition to the motion (Docket No. 34), Amtrak's reply (Docket No. 37), and the parties' other submissions on the motion (Docket Nos. 31–33, 35–36, 38–40). The Court also considered the parties' presentations at Oral Argument held on August 7, 2024. Upon consideration of the foregoing and for the reasons set forth herein, the Court will grant in part and deny in part Amtrak's motion.

## I.    <u>Background</u>

Kosmac's employment relationship with Amtrak began in August 2008 when he was hired as a police officer by the Amtrak Police Department ("APD") in Philadelphia. (Docket No. 31, ¶ 8). Kosmac thereafter applied to become a regional detective with the APD, and he was selected for the position, based in Pittsburgh. (*Id.* ¶ 9). As the regional detective of APD's Mid-Atlantic North Division, Kosmac was responsible for covering western Pennsylvania, Ohio, western Maryland, and part of West Virginia. (*Id.* ¶ 11). Kosmac was supervised most immediately by

Sergeants Charles Stefanowicz and Joseph Harper.  (*Id.* ¶ 12).  Higher up in Kosmac's chain-of-command were Captain Kevin O'Connell, Inspector Kevin Amberg, and Deputy Chief Maureen Powers.  (*Id.*).  When Kosmac first became a detective, his hours were 8:00 a.m. to 4:00 p.m., five days per week.  (*Id.* ¶ 17).  At that time, the Pittsburgh Amtrak station was open 24 hours per day, seven days per week.  (*Id.* ¶ 13).  But, in 2017 or 2018, the hours changed such that the Pittsburgh station was closed from 8:00 a.m. to 5:00 p.m.  (*Id.* ¶ 14).  With respect to Kosmac's schedule around this time, the record reflects that in January 2019 Kosmac responded to a communication about a schedule change sent by Captain O'Connell, wherein Kosmac indicated that he was working "nights" and that he intended to continue working nights because he had "gotten used to it." (Docket No. 33, ¶ 22).  Kosmac's response included a proposed schedule for himself consisting of "12's," *i.e.*, 12-hour shifts, running 8:00 p.m. to 8:00 a.m., Monday through Thursday.  (*Id.*).  Kosmac also offered to "go back to mon-fri daylight" if that was preferable.  (*Id.*).  Kosmac admits that, at least at that time (January 2019), he had "no issues working nights."  (*Id.* ¶ 23).

Around that same time—in early 2019—Kosmac's job performance was evaluated as part of an internal affairs investigation.  (*Id.* ¶ 27).  On March 11, 2019, at the conclusion of this investigation, Deputy Chief Powers and Sergeants Stefanowicz and Harper met with Kosmac and informed him that he needed to appear for his regular overnight shifts and be present when trains came into the Pittsburgh station.  (*Id.* ¶¶ 31, 34, 37).  On April 8, 2019, Kosmac emailed Deputy Chief Powers to correct the notion that he had not frequently been present at the station when trains were arriving.  (*Id.* ¶ 38).  Kosmac also added that working nights had come at a cost and expressed that his schedule was "miserable" and "sucked away" his personal life, while seemingly the only result of that sacrifice was greater exposure to employees who filed anonymous complaints.  (*Id.* ¶ 39).  Kosmac offered to go back to daylight hours, "respond[ing] in as needed [at] night," because

that schedule worked "better for [him]" anyway.  (*Id.*).  In this communication, Kosmac did not make any connection between his offer and/or request to make a schedule change and a physical or mental health impairment.  (*Id.* ¶ 40).  The record does not reflect that any change to Kosmac's schedule was made at that time; rather, the record reflects that Kosmac continued to work nights.

The next time Kosmac appears to have requested a schedule change was November 27, 2020, when he asked Sergeant Stefanowicz whether he could work 10-hour shifts with three days off (Friday, Saturday, Sunday).  (*Id.* ¶ 41).  Ultimately Deputy Chief Powers denied this request after consulting with the Chief of Police.  (*Id.* ¶ 45).  The following month (December 2020), Kosmac asked for a meeting with Deputy Chief Powers and his union president, Will Gonzalez. (*Id.* ¶ 50).  They met on December 18, 2020, at which time Kosmac asked to work a "daylight tour" one week each month, to give him an opportunity to complete tasks that could only be accomplished during business hours.  (*Id.* ¶ 51).  Kosmac testified that, at the meeting, he is "fairly certain" that there "was a lengthy discussion about the health issues [he] was having related to not sleeping."  (Docket No. 36, pg. 113, *Kosmac Deposition* at 119–20).  As a result of that meeting, Deputy Chief Powers gave Kosmac permission to work more daylight shifts; however, her understanding of the amount of daylight she approved and Kosmac's understanding of the same were not totally aligned insofar as Kosmac believed he was approved for up to two weeks of daylight shifts every month (Docket No. 33, ¶ 52), while Deputy Chief Powers believes that she gave Kosmac permission to "adjust his tour as needed" based on operational needs without giving him a specific number of days (Docket No. 36, pg. 250–51, *Powers Deposition* at 113–14). Regardless of how many daylight shifts Deputy Chief Powers approved, Kosmac and his supervisor Sergeant Stefanowicz believed that Kosmac had been approved to work up to two-weeks' daylight per month.  (Docket No. 33, ¶ 57).

Not long thereafter, in February 2021 and possibly before, Kosmac and Sergeant Stefanowicz discussed "how lack of sleep was causing increased anxiety and depression issues affecting [Kosmac's] personal life."  (Docket No. 36, pg. 115, *Kosmac Deposition* at 126). Kosmac testified that he expressed suicidal thoughts to Sergeant Stefanowicz, *i.e.*, that he was going to drive his car in front of a train, and he opined that Sergeant Stefanowicz probably should have sent him home.  (*Id.*).  However, Sergeant Stefanowicz does not recall Kosmac expressing any suicidal ideation.  (Docket No. 38, ¶ 93).  Though this factual question of whether Kosmac ever expressed suicidal ideation to Sergeant Stefanowicz—who was his superior, but with whom he was also friendly—is disputed, Sergeant Stefanowicz does recall Kosmac expressing difficulty working nights, and that he relayed at least some of Kosmac's concerns to Captain O'Connell in a February 19, 2021, email, writing:

> I have spoken with … Kosmac regarding the shift he is … working. He expressed how it is starting to affect his personal life.  He is losing touch with many people he knows because of his availability….  [I]t can almost seem like solitary confinement…. [H]e does not know how much longer his girlfriend would be able to deal with his schedule….  [I]s there something that we can do to alleviate the situation?  … Detective Kosmac does adjust his shifts … to ensure follow ups are completed, but as we all know working a mix of days and nights can throw off a person's sleep cycle.  A proposal I thought of would be to work daylight the 1st and 4th week of the month, while working midnights the 2nd and 3rd week.  A suggestion Kosmac recommended was splitting up the day, making sure he was there for the trains at night, and still having time during the day for normal business.  I understand the nature of the beast, but I am trying to find a happy medium.

(Docket No. 33, ¶ 54).  After this email was sent up the chain-of-command from Captain O'Connell to Inspector Amberg, and finally to Deputy Chief Powers, Captain O'Connell responded to Sergeant Stefanowicz that Deputy Chief Powers had already given Kosmac permission to adjust hours as needed.  (*Id.* ¶ 56).  And, as indicated above, Sergeant Stefanowicz and Kosmac took this to mean—and Kosmac insists it did mean—that he was approved to work

4

two weeks' daylight every month.  (*Id.* ¶ 57).  Accordingly, Kosmac worked two consecutive weeks' daylight per month from February 2021 until the end of July 2021.  (*Id.* ¶ 60).[1]

Kosmac's scheduling arrangement continued until Kosmac's other immediate supervisor—Sergeant Harper—returned from a leave of absence and sought to reconcile Kosmac's work schedule with what was in the "Telestaff" system used to track APD personnel.  (*Id.* ¶¶ 62–63).  Sergeant Harper emailed Kosmac on July 20, 2021, asking Kosmac for an account of his schedule.  (*Id.* ¶ 64).  Kosmac responded that he was rotating his schedule between days and nights in two-week blocks.  (*Id.* ¶ 65).  Kosmac also indicated in the email that he would be unable to switch between days and nights weekly (*i.e.*, that he would need blocks of two weeks), and that Fridays and Saturdays were his rest days.  (*Id.* ¶¶ 66–67).  Sergeant Harper discussed this with Inspector Cosner who indicated he was unaware of any approval of that schedule, prompting Sergeant Harper to respond to Kosmac on July 22, 2021, that Kosmac ought to resume his regular schedule and rest days (*i.e.*, his all-overnights schedule) but that he could adjust his schedule for business-related reasons.  (*Id.* ¶ 70).  After receiving Sergeant Harper's response, Kosmac tried to call multiple people in his chain of command, and he left Sergeant Harper a voicemail.  (*Id.* ¶¶ 71–72).[2]  He called off sick the following day—July 23, 2021—later submitting a doctor's note on July 27th indicating he had been unable to work "due to severe dehydration and IBS."  (*Id.* ¶¶ 73–74).

---

[1]     Kosmac testified that sometimes he worked even more daylight during this time: "Sergeant Stefanowicz … allowed more flexibility to permit me to work more daylight hours.  So, the bare minimum was two and two as agreed to by Deputy Chief Powers.  Sometimes it would be two and two, sometimes it would be three weeks, sometimes it might be a whole month of daylight shift."  (Docket No. 36, pg. 119, *Kosmac Deposition* at 141–42).

[2]     "I tried to call a couple of people … and I don't believe anybody actually answered."  (Docket No. 36, pg. 119, *Kosmac Deposition* at 144).

On August 5, 2021, Kosmac returned to his doctor and obtained another note that indicated he had "**sleep shift disorder**, **generalized anxiety disorder**, and **major depressive disorder**" due to his "work frame." (*Id.* ¶ 75). This was the first diagnosis that Kosmac received for those three conditions. (*Id.* ¶ 76). Kosmac thereafter submitted a Family and Medical Leave Act (FMLA) request, which was denied due to ineligibility. (*Id.* ¶¶ 77–78).[3] Amtrak then submitted a request on Kosmac's behalf pursuant to his collective bargaining agreement (CBA) which resulted in an approval of leave from August 5, 2021, to December 15, 2021. (*Id.* ¶¶ 78–79). While on leave, Kosmac discussed his anxiety and depression with Sergeant Ingram (his union representative[4]), who was made aware of Kosmac's treatment for depression. (*Id.* ¶ 81). Kosmac also spoke with Sergeant Stefanowicz while on leave, but they did not discuss reasonable accommodations that could be put in place when Kosmac returned to work. (*Id.*).

Then, on November 1, 2021 (approximately six weeks before the end of his approved leave), Kosmac emailed his resignation to Sergeant Stefanowicz to be effective November 12, 2021. (*Id.* ¶ 82). November 12th was the date that Kosmac's accrued paid time off ran out. (*Id.* ¶ 83). Kosmac has indicated that he resigned because "he understood from Sergeant Harper's July

---

[3]    Kosmac was ineligible for FMLA leave because of the number of employees within a 75-mile radius of his worksite. (*Id.* at ¶ 77); 29 U.S.C. § 2611(2)(B)(ii) (excluding from "eligible employee[s]" those who work at a worksite where the employer employs fewer than 50 employees within 75 miles).

[4]    Kosmac had previously discussed issues pertaining to his schedule and sleep with Ingram. (Docket No. 35, ¶¶ 7–8 ("Kosmac also spoke with Sergeant Nicholas Ingram, his union representative, about his request for a reasonable accommodation of a change in his work schedule to work more daylight hours," and "Kosmac talked with Sergeant Ingram between 10 and 20 times about issues he was having with sleep and stress." (citing *Kosmac Deposition* at 67 and *Ingram Deposition* at 37-38))). Kosmac also indicates that he told Sergeant Ingram that he was dealing with anxiety. (*Id.* ¶ 9 (citing *Ingram Deposition* 38-39)). Sergeant Ingram indicated in his deposition: "As [Kosmac's] union rep, he talked to me about that he was having troubles with sleep due to his schedule working in the evening. He said that he was stressed and wasn't able – wasn't getting a lot of sleep based off his schedule" (*Ingram Deposition* at 37); that he estimated Kosmac spoke to him about his sleeping and stress fewer than twenty but more than ten times" (*id.* at 38); and that Kosmac shared that he was suffering depression or anxiety "[b]ecause, you know, his home situation and work and everything else" (*id.* at 39).

22, 2021[,] email that Amtrak would no longer allow him any flexibility in his work schedule and he could not work strictly midnight shift due to his medical conditions." (Docket No. 35, ¶ 90). After Kosmac departed, Amtrak hired Detective James Fitch as his replacement. (Docket No. 33, ¶ 101). It is disputed whether Detective Fitch works an overnight schedule. (*Id.* ¶ 102).[5]

After resigning, Kosmac filed this action against Amtrak alleging that it violated the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA") by refusing to provide a reasonable accommodation for his disability and constructively discharging him. Kosmac seeks declaratory judgment, reinstatement as a detective with the APD, and lost wages, among other things. Amtrak moves for summary judgment, attacking various components of Kosmac's case, including his ability to show he had a disability or that Amtrak ever knew of the disability while Kosmac was employed there. The motion is fully briefed and is ripe for disposition.

## II.     Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)*; see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247–48). "An issue is 'genuine' if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue." *Id.* (quoting *Anderson*, 477 U.S. at 247–48). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

---

[5]     The parties also dispute whether evidence regarding Kosmac's replacement's schedule would be admissible at a trial. (*See* Docket No. 38, ¶ 102: "Amtrak objects to Kosmac's testimony regarding what Detective Spera allegedly told him about Detective Fitch's work schedule as inadmissible hearsay to which no exception applies.").

that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When ruling on a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party without weighing the evidence or questioning the witnesses' credibility. *Boyle*, 139 F.3d at 393. The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must "make a showing sufficient to establish the existence of an element essential to that party's case" for those elements "on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("*Catrett*"). If the movant has pointed to sufficient evidence of record to demonstrate that no genuine issues of fact remain, the burden is on the non-movant to search the record and detail the material controverting the movant's position. *Schulz v. Celotex Corp.*, 942 F.2d 204, 210 (3d Cir. 1991). Rule 56 requires the non-moving party to go beyond the pleadings and show, through the evidence of record, that there is a genuine issue for trial. *See Catrett*, 477 U.S. at 324.

## III.   Discussion

The ADA prohibits employers from discriminating "against 'qualified individuals on the basis of disability' as to 'job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Voigt v. Fluor Marine Propulsion, LLC*, No. CV 21-378, 2024 WL 555088, at *5 (W.D. Pa. Feb. 12, 2024) (quoting 42 U.S.C. § 12112(a)). Kosmac has alleged that Amtrak violated the ADA by failing to accommodate a known disability and by effecting his constructive

discharge. Kosmac's PHRA claim addresses the same conduct. *Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014). Kosmac's failure-to-accommodate and discrimination claims are intertwined insofar as Kosmac "alleges that in failing to accommodate him, [Amtrak] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign, rendering his resignation a constructive discharge as well as an adverse employment action." *Smith v. Smith Transp., Inc.*, No. CV 3:20-CY-00250-SLH, 2023 WL 6389073, at *8 (W.D. Pa. Sept. 29, 2023). *See* Docket No. 34, pg. 15 (citing *Smith*, 2023 WL 6389073, at *8). Accordingly, in the Court's assessment of Amtrak's summary judgment motion, Kosmac's claims may be assessed together because "if there is a genuine dispute of material fact as to whether [Amtrak] failed to accommodate [Kosmac] and a jury could reasonably infer that [Amtrak], in doing so, permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign, constructively discharging [Kosmac], [then Kosmac's] [constructive discharge] claim may survive summary judgment." *Id.*

In its motion for summary judgment, Amtrak argues that Kosmac lacks evidence to establish the essential elements of his case at trial. Amtrak primarily argues—and the parties' dispute mainly concerns—whether there is sufficient evidence in the record for Kosmac to make out his *prima facie* case of disability discrimination.[6] The *prima facie* elements of a failure-to-

---

[6]     When there is no direct evidence of discrimination in an ADA case, the *McDonnell Douglas* burden shifting analysis applies. *Voigt*, 2024 WL 555088 at *5. The first step of the *McDonnell Douglas* framework asks whether a plaintiff can satisfy the elements of a *prima facie* case. *Id.* Only then does the burden shift to a defendant-employer to show there was a legitimate and non-discriminatory reason for the action it took. *D'Agostino v. Kendall*, No. CV 19-281 (RBK/AMD), 2021 WL 4860095, at *6 (D.N.J. Oct. 19, 2021). And, if the defendant can make such a showing, then the burden comes back to the plaintiff-employee to show the proffered reason(s) was pretextual. *Id.*

Amtrak's argument for summary judgment is primarily that Kosmac cannot establish the elements of his *prima facie* case. Amtrak briefly argues that, additionally, it had a legitimate and nondiscriminatory reason for its actions. (Docket No. 30, pg. 18). However, the parties' arguments regarding the second two steps of the *McDonnell Douglas* framework are too fleeting for the Court to resolve Amtrak's summary judgment motion on that basis. Accordingly, the Court's adjudication of the instant motion is premised

accommodate ADA claim are: (1) the plaintiff has a "disability"; (2) he is a "qualified individual"; and (3) he suffered an adverse employment action because of his disability. *McNelis v. Pennsylvania Power & Light Co.*, 867 F.3d 411, 414 (3d Cir. 2017). The third element—the adverse employment action—in a failure-to-accommodate claim is an employer's "refusal to make reasonable accommodations for an employee's disabilities." *Voigt*, LLC, 2024 WL 555088, at *7 (quoting *Fowler v. AT&T*, Inc., 19 F.4th 292, 306 (3d Cir. 2021)). Amtrak argues that admissible record evidence can neither prove that Kosmac suffered from a disability during the relevant time, nor that he is a qualified individual. Amtrak also argues that even if Kosmac could prove he was disabled while employed by Amtrak, it lacked notice of a disability yet adequately accommodated him (a) when it effectively approved a flexible mix of daylight and night shifts for the spring of 2021, and (b) when it approved his request for leave from August 5, 2021, to December 15, 2021, upon receiving official diagnoses of Kosmac's sleep, anxiety, and depressive disorders.

The Court begins its evaluation of Amtrak's arguments by evaluating whether Kosmac was disabled during the time relevant to his claims. This determination must be made on a "case-by-case" basis. *D'Agostino v. Kendall*, No. CV 19-281 (RBK/AMD), 2021 WL 4860095, at *7 (D.N.J. Oct. 19, 2021). Under the ADA, and individual is "disabled" if he: "(1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Id.* at *6 (citing 42 U.S.C. § 12102). This definition is broadly construed in favor of maximum coverage. *Id.* That said, disability is more than just a diagnosis. *Id.* at *7 ("A diagnosis alone, no matter how severe, is insufficient to establish a disability under the ADA.").

---

upon the first step of the *McDonnell Douglas* framework and the Court will make no assessment of whether Amtrak can prove it had a legitimate, nondiscriminatory reason for its actions, or whether Kosmac could prove any such reasons were pretextual.

In this case, the evidence of record shows that Kosmac was diagnosed with three impairments on August 5, 2021: sleep shift disorder, generalized anxiety disorder, and major depressive disorder.  Amtrak argues that this date—August 5, 2021—is the earliest that Kosmac could seek to establish disability.  But Kosmac argues that, at the very least, the record raises a question of fact as to whether Kosmac's difficulty sleeping, anxiety, and depression preceded his diagnoses and limited one or more major life activities, *i.e.*, constituted a disability.  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."   42 U.S.C. § 12102(2)(A).  Having considered the available evidence, the Court cannot at this point definitively conclude that Kosmac was *not* suffering from a physical or mental impairment that substantially limited one or more major life activities prior to the date of his diagnoses.  At Oral Argument, when the Court asked counsel for Amtrak whether a diagnosis by a medical professional is necessary to establish disability under the ADA, Amtrak's response was that disability under the ADA is a highly fact-specific inquiry.  The Court agrees.  And, in this case, the facts relevant to whether Kosmac proffered evidence sufficient to prove he has a disability, particularly prior to his diagnoses in the spring of 2021, will depend largely upon Kosmac's credibility as a witness which the Court may not weigh at this juncture.  For that reason, the question of Kosmac's purported disability during the time relevant to his claims remains a genuinely disputed question of material fact.

However, to overcome Amtrak's motion, Kosmac must additionally show that there is evidence in the record to prove that Amtrak was on notice of Kosmac's purported disability at the time Amtrak failed to accommodate him.  *See* 42 U.S.C. § 12112(b)(5)(A) (discrimination includes failure to make reasonable accommodations to *known* physical or mental limitations).   This,

Amtrak argues, is why it is especially critical that Kosmac was not diagnosed with sleep disorder, anxiety, or depression until August 5, 2021.  According to Amtrak, August 5th is the first point at which Kosmac's superiors could have known that he was suffering from a disability necessitating an accommodation.  And, once Kosmac's superiors were on notice, they accommodated him, *i.e.*, he asked for leave and Amtrak approved it.

Amtrak is correct that an employer is not expected to accommodate disabilities of which it is unaware.  *Anselmo v. City of Philadelphia*, No. CV 18-5160, 2021 WL 308132, at *17–18 (E.D. Pa. Jan. 29, 2021) ("Plaintiff's vague complaints … did not provide enough information for Defendants to recognize that she had a 'disability' that required an accommodation" and a "doctor's note that Plaintiff should be excused from work … but could return to work two days later 'without restrictions,' was insufficient to put Defendants on notice of any disability."); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability."). In *Conneen v. MBNA America Bank, N.A.*, the United States Court of Appeals for the Third Circuit affirmed summary judgment in favor of MBNA, the defendant-employer, when it determined no reasonable juror could decide that MBNA terminated Conneen because of her disability.  334 F.3d 318, 321 (3d Cir. 2003).  In that case, Conneen charged her former employer with violating the ADA when it withdrew a late-arrival accommodation that it had previously afforded her.  *Id*. at 325.  The district court decided that MBNA lacked notice of the disability at the relevant time and awarded summary judgment in its favor.  *Id.*  Affirming that decision, the Third Circuit explained that while "an employer is liable for discriminating against an employee in need of accommodation based upon the employee's *known* disability, neither the law nor common sense can demand clairvoyance."  *Id.* at 331.  The employee in that case, Conneen, had repeatedly shown up late to

work, and the Third Circuit determined that her failure to cite a health impairment as the reason for her tardiness was an impediment to the employer's knowledge of her disability or the need for any accommodation. *Id.* The Third Circuit further explained that while the ADA does not require an employee to use "magic words" to notify her employer of a disability or need for an accommodation, the employee must, by some "appropriate means" make it clear that assistance for his or her disability is needed. *Id.* at 332 ("The employer must have enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." (citing *Taylor*, 184 F.3d at 313)).[7]

Here, the parties do not dispute that: Kosmac gave notice to his superiors in April 2019 that working nights negatively affected his personal life; he requested more daylight hours in December 2020; he told Sergeant Stefanowicz that his schedule was negatively affecting his life and that he wanted to work more daylight in February 2021; when Sergeant Harper indicated Kosmac ought to return to his regular overnight schedule on July 22, 2021, Kosmac obtained a doctor's note saying he could not work due to dehydration and IBS (July 27, 2021); and, finally, Kosmac was diagnosed with sleep shift disorder, anxiety, and depression on August 5, 2021 and was approved for leave between August 5th and December 15, 2021.

But while those facts are agreed upon, there are other relevant facts in the record that are disputed, particularly facts concerning conversations that Kosmac alleges he had with superiors that, if true, would support an inference that Amtrak had notice of his disability. This evidence

---

[7]    Ultimately, then, the Third Circuit determined that Conneen was responsible for the breakdown of the interactive process with MBNA to find appropriate accommodation(s) when, instead of notifying her employer of the medical basis for her tardiness, she proffered excuses for lateness that included "heavy traffic, giving a parent a ride, or cleaning up after a pet." *Id.* Her employer, on the other hand, had engaged with Conneen with "patience and prudence" and could not be found by any reasonable juror to have not made a good faith effort to engage in the interactive process. *Id.* at 334.

includes: testimony that he told his union representative between ten and twenty times that he was dealing with sleep and stress, and that he also discussed anxiety with his union representative;[8] his recollection that he likely had a discussion with Deputy Chief Powers about health issues that had arisen because he was not sleeping; his expression of concerns and (according to his recollection) suicidal thoughts to Sergeant Stefanowicz; and that he discussed his anxiety and depression with Sergeant Stefanowicz and his union representative while he was on medical leave.  At Oral Argument, Kosmac's counsel pointed to these facts and emphasized that by the time Kosmac verbalized his anxiety and depression—particularly, when it got to a point that he made comments to Sergeant Stefanowicz about driving into a train, and perhaps other suicidal ideations—that's when Amtrak ought to have been put on sufficient notice to start a conversation about disability and accommodations.  Sergeant Stefanowicz does not recall these conversations, but Kosmac has indicated he will attest to them, and because Kosmac's testimony alone, if believed, has the potential to prove a disputed fact, this question of notice remains a genuine dispute of a material fact.  *See Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987) ("There is simply no rule of law that provides that a discrimination plaintiff may not testify in his or her own behalf, or that such testimony, standing alone, can never make out a case of discrimination that will survive a motion for summary judgment.").

The Court is not persuaded to come to a different conclusion and to find that Amtrak lacked notice as a matter of law based on Amtrak's argument that it should not have been expected to glean notice of Kosmac's purported disability from circumstantial evidence, especially not when

---

[8]    However, the Court notes that those communications with union representatives only matter inasmuch as the union representative relayed this information to Amtrak. *See Behm v. Mack Trucks, Inc*., No. 5:21-CV-02500-JMG, 2022 WL 2068425, at *9 (E.D. Pa. June 8, 2022), *aff'd*, No. 22-2223, 2023 WL 3171559 (3d Cir. May 1, 2023).

his main complaints pertained to his inability to sleep.  Amtrak points out that when an employee raises concerns associated with sleep, it is especially difficult for an employer to be on notice of a disability because sleep complaints are so common.  For instance, in *Howard v. Steris Corp.*, the district court determined that plaintiff-employee Howard's failure-to-accommodate claim would fail because Howard did not provide adequate notice to his employer about why he needed an accommodation, even though his obvious difficulty of falling asleep on the job was, in fact, due to medical conditions (narcolepsy and Graves' Disease).  886 F. Supp. 2d 1279, 1292–93, 1298 (M.D. Ala. 2012) (explaining that a less demanding notice requirement would "require employers to don white coats and diagnose (correctly, no less) employees having any potentially health-related difficulties at work, and then proactively accommodate them on pain of liability under the ADA"), *aff'd*, 550 F. App'x 748 (11th Cir. 2013); *D'Agostino*, 2021 WL 4860095, at *7 ("The burden of showing a disability based on sleep problems is quite high." (citing *Sloan v. City of Pittsburgh*, 110 Fed. App'x 207, 212 (3d Cir. 2004)).  Furthermore, there are cases suggesting that complaints of poor sleep perhaps do even less to provide notice of a disability when an employee works nights regularly.  *See e.g.*, *Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 F. App'x 312, 318–19 (5th Cir. 2013) ("[T]he parties agree that [plaintiff] never tied her request for an alternate on-call rotation to insomnia or a sleeping disorder of any kind; at most, she complained of being sleep deprived," but "[t]he very nature of on-call duty interferes with one's sleep; thus, complaining of sleepiness while on-call would not trigger notice of a disability.").

These cases support the view that generalized complaints of sleep-deprivation are usually insufficient to put an employer on notice of an employee's disability.  However, as the Court has explained, there is a factual dispute as to whether Kosmac expressed earnest suicidal ideation to Sergeant Stefanowicz and whether inferences may be drawn from such testimony to conclude that

Amtrak knew Kosmac had a disability and needed accommodation for it.  Resolving that dispute about exactly what Kosmac shared with Sergeant Stefanowicz will depend, in large part, on comparable credibility determinations among Kosmac and Sergeant Stefanowicz.  At this time, the Court cannot say that no reasonable jury could find Amtrak was put on notice of a mental health impairment that was limiting enough to constitute a disability as early as Kosmac recalls making such statements.  Accordingly, the Court finds that notice is also a genuinely disputed material fact.

Having determined that there are genuine disputes of material fact pertaining to disability and notice that preclude summary judgment for Amtrak on those bases, the next question that the Court will address is whether Kosmac has shown that he could prove the third element of an ADA prima facie case to a jury: that he suffered an adverse employment action, that is, that he was denied reasonable accommodation.  It is here that Kosmac's case is in greatest jeopardy, because from the record it appears that Amtrak *largely accommodated* Kosmac, allowing him to work a modified schedule in spring 2021 and approving his request for leave from August 5th to December 15th, 2021.

The ADA defines a "reasonable accommodation" as including:

> ... job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Voigt*, 2024 WL 555088, at *7 (quoting 42 U.S.C. § 12111(9)(B)).  The ADA's reasonable-accommodation requirement does not demand that an employer grant the specific accommodation requested by a disabled employee; rather, "the employer need only provide *some* reasonable accommodation." *Id.* (quoting *Yovtcheva v. City of Philadelphia Water Dep't*, 518 F. App'x 116,

122 (3d Cir. 2013)) (emphasis added).  According to the undisputed facts in this case, drawn in the light most favorable to Kosmac, by the time he could first be said to have requested an accommodation for a substantially limiting mental health impairment, he was effectively approved to work multiple weeks' daylight hours monthly, from February 2021 to July 21, 2021.  Then, on July 22, 2021, the record shows that Sergeant Harper—who was reconciling Telestaff records upon a return from his own leave of absence — effectively rescinded the accommodation Kosmac had acted under for most of the calendar year to that point when he instructed Kosmac to resume his regular nightshift schedule.[9]  In the Court's estimation, a reasonable juror could find that Sergeant Harper's decision to require Kosmac to go back to mostly overnights without permission to work blocks of daylight (which he had operated under from February to July of 2021) was a denial of a reasonable accommodation.

Of course, any such denial of this accommodation was short-lived insofar as Kosmac and Amtrak continued to interact during this time and Kosmac was provided with a different accommodation shortly thereafter, the accommodation this time being a leave of absence under his CBA.  *See Behm v. Mack Trucks, Inc.*, No. 5:21-CV-02500-JMG, 2022 WL 2068425, at *9 (E.D. Pa. June 8, 2022) (explaining that the employee in this case was denied a shift change, *after which* her employer was made aware of her disability, but that there was no breach of the employer's duty to accommodate because by the time the employer became aware of the employee's disability, she had requested a paid medical leave of absence and the employer granted her request), *aff'd*, No. 22-2223, 2023 WL 3171559 (3d Cir. May 1, 2023)).

---

[9]     Kosmac has not argued—and the Court is not aware—of any legal doctrine indicating that because Sergeant Stefanowicz and Kosmac may have believed *in error* that Deputy Chief Powers approved a modified schedule for Kosmac in the spring of 2021, that accommodation—approved in error—would fail to satisfy any obligation to accommodate a disability.

Kosmac argues that during his leave Amtrak ultimately failed in its obligation to confer in good faith about what accommodation(s) might have made it possible for Kosmac to return to his position and that this failing ultimately is what convinced him he had no choice but to resign. He argues that Amtrak's failure to offer to fashion an accommodation that would have applied upon his return effectively forced his resignation in violation of the ADA. *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) ("Constructive discharge occurs when an 'employer knowingly permits conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984))). However, with respect to this aspect of Kosmac's claim—that he was constructively discharged because Amtrak failed to offer modifications to his schedule upon return while he was out on leave—it is the Court's determination that Kosmac has not identified evidence he could use to establish that conditions were so intolerable that he, like any reasonable person would have, felt forced to resign. *See Behm*, 2022 WL 2068425, at *6 ("Plaintiff has not come forward with any evidence that she had any interactions with Defendant during this [period of leave], much less interactions that could cause the conditions of her employment to become intolerable[;] [a]ccordingly, no reasonable jury could find that Plaintiff was constructively discharged from her position.").

The evidence in the record shows that Sergeant Stefanowicz and Kosmac's union representative, Sergeant Ingram, spoke with Kosmac during his leave, discussing his anxiety and depression, as well as the medication he was taking for the same. (Docket No. 33, ¶ 81). The parties agree that Kosmac's schedule was not a topic of conversation at that time, which Kosmac describes as a failure by both Sergeant Ingram and Sergeant Stefanowicz to raise the topic of reasonable accommodations. However, Amtrak points out several undisputed facts that show

Kosmac cannot prove the ADA was violated while he was out on leave, including that: when Kosmac had conversations with Sergeants Ingram and Stefanowicz, he was already being accommodated by virtue of having been approved for leave; Sergeant Ingram was not in Kosmac's chain of command or necessarily in a position to discuss reasonable accommodations; conversations that Kosmac had with Sergeant Stefanowicz were primarily friendly as opposed to business conversations; and Sergeant Stefanowicz *never* suggested that Kosmac resign.  (Docket No. 39, ¶¶ 87–88).

Moreover, what is most important in the Court's view is that the evidence unequivocally shows that Kosmac withdrew from the interactive process before any evidence would suggest his return or accommodations necessary therefor were ripe for discussion. The purpose of the interactive process is to arrive at an appropriate accommodation. *Taylor*, 184 F.3d at 316.  It requires a good faith effort on behalf of both the employer *and* the employee to determine an appropriate accommodation(s). *Id.* at 312.  Opting to file suit instead of participating with one's employer in the interactive process of determining appropriate accommodations is a failure of good faith on the part of the employee and precludes recovery for the alleged adverse employment action. *See Hofacker v. Wells Fargo Bank Nat'l Ass'n*, 179 F. Supp. 3d 463, 472 (E.D. Pa. 2016) ("Furthermore, an employer's good faith effort to identify and provide an accommodation provides a complete statutory defense to damages.").  Therefore, in this case it is the Court's determination that Kosmac has not identified evidence in the record he could present to a jury to show that Amtrak, during his leave period, failed to interact with him in good faith.  Particularly not when Kosmac resigned while he still was approved for several weeks' leave and did not point to any evidence showing that he gave his chain-of-command notice that he would be resigning if

negotiations for scheduling upon his return were not revisited promptly.   The failure of communication in Kosmac's resignation lies with Kosmac.

The Court's analysis thus far leads to an outcome in Amtrak's favor on its summary judgment motion for 2021 up until July 22, 2021, and from August 5, 2021, through his resignation.   However, the Court cannot say as a matter of law that Kosmac's failure-to-accommodate claim, from the time his daylight-weeks accommodation was rescinded until his request for leave was approved, fails.   There are unresolved questions, such as whether Kosmac was disabled and had provided adequate notice of disability to his employer, *e.g.*, by sharing suicidal ideations with Sergeant Stefanowicz, that make it more appropriate for a jury to weigh in on whether Sergeant Harper's—perhaps unwitting—withdrawal of Kosmac's accommodation constituted a brief period of unlawful failure-to-accommodate.

Amtrak argues that even if Kosmac could prove to a jury that it failed to accommodate a known disability at some point, Kosmac nonetheless could not prove any reasonable accommodation was possible because the evidence shows that overnight shifts were an essential function of the regional detective job.   *Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014) ("Even if the employee requests an accommodation and the employer refuses to engage in the interactive process, a prima facie case is not made out unless the employee also submits evidence establishing that she could have been reasonably accommodated." (citing *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997))).   Amtrak contends that overnights (or at least the ability to work that shift most of the time) was an essential job function due to, *inter alia*, the Pittsburgh train schedule with trains only running at night and the necessity of police presence in Pittsburgh.   Amtrak also contends that Kosmac testified that only a full return to daylight hours—meaning 8:00 a.m. to 4:00 p.m., five days per week—would be a sufficient

20

accommodation to allow him to do his job.  However, Amtrak also indicates that the APD operates around the clock and that detectives like Kosmac are, to a certain degree, always on call.  It would not be possible, of course, for an employee to work continuously, which seems to suggest that there was flexibility inherent in Kosmac's job.  Not only that, but until Sergeant Harper asked Kosmac to return to overnights, Kosmac apparently performed his work with a significant number of monthly daylight hours without complaint from his immediate supervisor, Sergeant Stefanowicz.

Additionally, while Amtrak argues it could not have accommodated full-time daylight hours, the record is unclear as to whether that was the only accommodation that would have been acceptable to Kosmac.  At his deposition, Kosmac did—as Amtrak points out—seem to indicate that only a fulltime daylight schedule would have been acceptable to him, *i.e.*, no nights:

> Q: Were there any accommodations other than a return to your original schedule that would have enabled you to perform your job as a detective?
>
> **A: Not that I'm aware of.**
>
> Q: Did you need to be on daylight hours full time?
>
> **A: Yes.**
>
> Q: Could you have worked a rotating schedule of some daylight hours and some night shift?
>
> **A: That was attempted for a brief period of time, but long term, no, that would not have solved the problem.**

(Docket No. 36, pg. 100, *Kosmac Deposition* at 66).  But, at another point in his deposition, Kosmac seemingly contrarily indicated that a split shift *would* have enabled him to do his job as a detective.  (Docket No. 36, pg. 116, *Kosmac Deposition* at 130–31).  Amtrak argued at Oral Argument that Kosmac's deposition testimony unequivocally indicated that the only accommodation that would have been sufficient for Kosmac would have been a fulltime daylight

tour that would not have been workable for Amtrak.   But the testimony just cited is not unequivocal.  It is open to different interpretations, and assessing Kosmac's testimony is better left to a factfinder than to this Court on a summary judgment motion.  Not only that, but as Amtrak conceded at argument, there is some evidence that Kosmac's replacement worked daylight, albeit perhaps only temporarily, and that he thereafter worked a shift that perhaps ran from 3:00 a.m. to 11:00 a.m.  This is yet another piece of evidence that shows there are unresolved fact questions about whether Kosmac could have been adequately accommodated.  That, and the other open questions the Court has identified herein, makes a decision for Amtrak at summary judgment inappropriate, except insofar as the Court has explained above.

## IV.   <u>Conclusion</u>

For all these reasons, Amtrak's motion for summary judgment is **<u>granted in part</u>** insofar as the Court will dismiss Count II of Kosmac's Amended Complaint wherein he alleges constructive discharge and the Court will limit any claim that Kosmac seeks to pursue that Amtrak failed to accommodate him in violation of the ADA and PHRA prior to July 22, 2021, or after August 5, 2021.  Amtrak's motion is **<u>denied in part</u>** insofar as the Court *has not* concluded that from July 22, 2021, to August 5, 2021, Kosmac would be unable to prove to a jury that Amtrak failed to accommodate a known disability.

An appropriate order to follow.

*/s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: September 20, 2024

cc/ecf: All counsel of record